GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:      Angela_Chuang@fd.org

Counsel for Defendant CALIX

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUIS CALIX,<br><br>Defendant. | **Case No.:** CR 20–19 RS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 3, 17th Floor<br>**Hearing Date:** October 26, 2021<br>**Hearing Time:** 2:30 p.m. |

# INTRODUCTION

Luis Calix comes before this Court for engaging in street-level drug activity related to a $10 sale of methamphetamine to an undercover officer. The impoverished environment in Honduras, exacerbated by a childhood marked by trauma and parental abuse, led him to the U.S. in 2019 in search of better opportunities. Once in the U.S., Mr. Calix worked various jobs in the construction industry to support himself. His employment was unstable, however, resulting in his regrettable and desperate decision to resort to dealing drugs on the street to make money. Since his arrest on the instant case, Mr. Calix has turned things around and has left that life behind, demonstrating significant rehabilitation and amenability to supervision. Since his release in early March 2021, he has maintained a spotless record of compliance with his conditions of pretrial release, which began with strict conditions including home detention enforced through location monitoring. Mr. Calix did so well on pretrial supervision that his home detention condition was modified to a curfew after two months. Based on his continued exemplary performance, he was taken off electronic monitoring altogether in August 2021. Mr. Calix faces draconian immigration consequences as a result of this conviction. Even though this case constitutes his one and only felony conviction, and despite his very minimal prior criminal record consisting of a single misdemeanor, that is enough to lead to not only his deportation back to Honduras, but also to ineligibility for numerous avenues of relief in immigration proceedings and permanent inadmissibility to the United States in the future. Before his near-certain deportation, he may additionally serve time in immigration custody, the length of which is unknown.

Mr. Calix takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of time served. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

# ARGUMENT

**I.  A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

In sentencing Mr. Calix, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Calix agrees with the Guidelines calculation in the Presentence Report ("PSR") with a final offense level of 15 and a Criminal History Category of II. *See* PSR ¶¶ 27, 33. The resulting advisory Guidelines range is 21–27 months.

### A.     The nature and circumstances of the offense

Mr. Calix was arrested as part of the government's Federal Initiative for the Tenderloin ("FITT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve relatively minor drug offenses that normally would be prosecuted only at the state level. Along those lines, Mr. Calix was arrested following his sale of $10 worth of methamphetamine to an undercover San Francisco Police Department ("SFPD") officer. *Id.* ¶¶ 8–9. When he was arrested, additional controlled substances were also found on his person.[1] *Id.* ¶¶ 9–11. This offense was a quintessential street-level drug sale that did not involve violence, weapons, threats, or other aggravating factors. When placed in perspective, Mr. Calix's offense is relatively minor, and accordingly does not warrant additional time in custody beyond that which he has already served and the time he spent in home detention.

---

[1] These substances did not include fentanyl.

**B.     The history and characteristics of Mr. Calix**

1. Mr. Calix's background and exceptional performance on pretrial supervision

Mr. Calix was born in Francisco Morazán, Honduras, where he and his younger brother, Llorwin, were raised by their mother. *Id.* ¶¶ 39–41. His father left the family when Mr. Calix was a three-year-old toddler, leaving his mother to raise the children on her own. *Id.* ¶ 41. His mother struggled to make ends meet on her own—Mr. Calix recalls that throughout his childhood, the family often did not have enough food to eat or clothes to wear. *Id.* His father periodically reappeared, but these instances were not happy reunions. Rather, his father would regularly engage in verbal and emotional abuse directed at Mr. Calix and his brother. *Id.* ¶ 43. The abuse escalated and worsened when Mr. Calix was 16, when his father moved back in with the family. *Id.* ¶ 44. There were at least two incidents where his father shot a pistol into the air to scare the kids, and then locked them out of the house when they ran out in fear. *Id.* ¶ 46. Mr. Calix's father also demanded that he drop out of school to begin working, which prompted the two brothers to run away to their grandmother's home. *Id.* ¶ 44. Even there, they could not escape their father's anger. At one point, Mr. Calix's father showed up and beat Mr. Calix with a belt to force him to start working. *Id.* ¶ 45. Mr. Calix ultimately acceded to his father's demands, dropping out of school to begin working in the fields and in construction. *Id.* ¶ 62.

Even though Mr. Calix began working full-time as a teenager, he and his family still lived in poverty and faced difficulties in meeting their basic needs. *See id.* ¶ 48 (noting Mr. Calix's explanation that he "often wore shoes that were torn or clothing that was extremely worn [out]"). Ultimately, he moved to the U.S. in 2019 in search of higher-paying work, and in turn, greater economic opportunity. *Id.* Since 2019, he worked various jobs in the construction and carpentry industries, but the jobs were not dependable or steady. *Id.* ¶ 61. When he was not able to sustain stable employment, he fell victim to the desperate need to make quick money and began dealing drugs on the street. This poor decision is what led to the conduct that brings him before this Court, where he now stands with a felony conviction.

While this case has been pending, Mr. Calix has made enormous strides and has performed admirably on pretrial supervision, with absolutely no pretrial violations to date. After he was arrested

on this matter in February 2021, he spent 10 days in custody before he was ordered released. However, due to a San Francisco County state warrant that had issued while he was in federal custody, he was then transferred to state custody. His actual release was not until several days later in the beginning of March.[2] Following his release, he adhered to his pretrial conditions and instructions by checking in with Pretrial, picking up an ankle monitor, and navigating his way through public transportation to travel to his approved residence—his brother's house in the Central District. Mr. Calix spent slightly over two months on home detention with electronic monitoring. This form of intense supervision is more akin to home confinement than to release, as Mr. Calix could not leave except for certain pre-approved purposes. He then spent another three months on electronic monitoring with a curfew. He did not violate these conditions even once. Mr. Calix's exceptional performance on pretrial supervision while this case has been pending demonstrates substantial rehabilitation and warrants a significant downward variance. Significantly, he would not receive any credit from the Bureau of Prisons for his time spent on an ankle monitor or in home detention. This Court should take into consideration the five-and-a-half months that Mr. Calix was subject to intense supervision via electronic location monitoring, and in particular, the roughly two months that he spent in home detention, by imposing a custodial term of time served. *See* U.S.S.G. § 5C1.1(e) (stating that one day of home detention can substitute for one day of imprisonment).

The current circumstances of the ongoing COVID-19 pandemic also cannot be ignored. Since the inception of the pandemic in March 2020, this Court has no doubt become extremely familiar with the susceptibility of correctional facilities to widespread COVID-19 outbreaks. Minimizing the jail population density by imposing time-served sentences where appropriate—such as in the instant matter where Mr. Calix has proven that he poses no danger to the community and that he can abide by conditions of supervision—would protect not only Mr. Calix but also the community at large. *See, e.g.*, *New Study Finds Crowded Jails Seeded Millions of COVID-19 Cases*, EQUAL JUSTICE INITIATIVE (Sept. 7, 2021) (explaining that "[h]ad jails . . . reduced jail populations by an estimated 80%, that level of decarceration would have been associated with a 2% reduction in daily Covid-19

---

[2] All state charges were dismissed shortly thereafter.

DEF'S SENT. MEM.
*CALIX*, CR 20–19 RS

5

case growth rates, which translates to the prevention of millions of cases," and quoting one researcher as stating that "[t]he high rate at which people are cycled between communities and unnecessary short-term stays in jails is creating epidemiologic pumps that drive more and more infections in both jails and communities"). Mr. Calix has learned his lesson and he has learned it well; imposing a sentence that would put him in jail during a pandemic would serve no additional purpose and would be overly punitive.

### 2. Immigration consequences for Mr. Calix

It is almost certain that Mr. Calix will be deported following resolution of the instant matter. Because of the nature of the charge, this conviction will trigger draconian immigration penalties beyond deportation. Almost every avenue for relief that he otherwise would be able to pursue as a potential defense in immigration proceedings will no longer be available to him. Most severely, Mr. Calix will be rendered permanently inadmissible to the United States, meaning that he will be barred from re-entry for the rest of his life. Finally, before his deportation, he could spend an uncertain period of time in immigration detention—a time period that could easily stretch to a month or more—which would serve as an additional custodial consequence of his conduct.

### 3. Conditions in Honduras

As set forth above, Mr. Calix came to the United States from Honduras because he could not meet his basic needs and there was no realistic opportunity of gainful employment there. Although this fact does not excuse Mr. Calix's criminal conduct, it does provide an important perspective, especially when considering the role in creating those conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter 2018 Crime & Safety Report][3]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war.").[4] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center,

---

[3] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
[4] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.

DEF'S SENT. MEM.
*CALIX*, CR 20–19 RS

6

are two of the ten most dangerous cities in the world. Central America Refugee Crisis, U.N. REFUGEE AGENCY[5]; *see also* Gangs in Honduras at 1. Violence in Honduras includes "homicide, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[6]

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[7] In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017).[8] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and demonstrate why many people such as Mr. Calix are fleeing in hopes of creating safer and more sustainable lives.

---

[5] Available at https://www.unrefugees.org/emergencies/central-america/.
[6] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.
[7] Available at https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.
[8] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.

**C.      The need to avoid unwarranted sentencing disparities**

A time-served sentence would avoid unwarranted disparities with defendants in strikingly similar cases arising from the FITT. This becomes especially apparent when one looks at the circumstances of cases ending in a time-served sentence where the defendants had a more extensive criminal or deportation history than in the instant matter. The following cases are illustrative:

- *United States v. Jesus Flores*, CR 19-429 SI. Mr. Flores was arrested for a $15 drug sale. Officers found $932 cash and other drugs on him, including 56 grams of cocaine base, 38.2 grams of heroin, 32.5 grams of methamphetamine, and 31.1. grams of marijuana (gross weights). He had been deported twice in the past. Mr. Flores' Guidelines range was 10–16 months. Judge Illston sentenced him to time served (effectively four months).

- *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of a $17 heroin sale. His Guidelines range was 8–14 months. Mr. Cabrerra's record was far more serious than Mr. Calix's, as it included three prior convictions for drug sales—including one that resulted in a four-year prison sentence—and six deportations. Judge Orrick sentenced him to time served (effectively four months).

- *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16 crack cocaine sale. He was on probation at the time of the offense, and faced a Guidelines range of 8–14 months with an offense level of 10 and a Criminal History Category of II. Judge Orrick sentenced him to time served (effectively one month).

- *United States v. Ristir Trejo*, CR 19-535 RS. Mr. Trejo faced charges stemming from four different drug sales, including fentanyl, over a period of 15 months. His record included a prior misdemeanor drug conviction as well as a prior federal misdemeanor conviction for illegal entry. His Guidelines range was 21–27 months. This Court sentenced Mr. Trejo to time served (effectively 6 ½ months).

- *United States v. Jose Ramos-Varela*, CR 19-713 EMC. Mr. Ramos-Varela was arrested for a $20 methamphetamine sale, and additional heroin was recovered from his person when he was arrested. He had one prior deportation that occurred subsequent to a prior

felony drug conviction. His Guidelines range was 10–16 months. Judge Chen sentenced him to time served (effectively two months).

- *United States v. Saul Eldibrando Escoto Villatoro*, CR 19-720 RS. Mr. Villatoro was arrested for a $20 methamphetamine sale. An additional 36 bindles of cocaine base, 21 bindles of heroin, and over $1500 were recovered from his person. His Criminal History Category was II and his Guidelines range was 12–18 months. This Court sentenced him to time served (effectively three months).

What truly stands out about Mr. Calix even relative to other FITT defendants is his post-arrest rehabilitation and phenomenal performance on pretrial release, which included two months on home detention and nearly six months on electronic monitoring. That distinction is crucial and warrants a downward variance to a sentence of time served.

## CONCLUSION

For all the reasons set forth above, Mr. Calix respectfully requests that the Court impose a sentence of time served. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:   October 19, 2021                  Respectfully submitted,

GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California

           /S
ANGELA CHUANG
Assistant Federal Public Defender